# Exhibit "A"

GANA LLP
Adam J. Gana, Esq.
Adam J. Weinstein, Esq.
Daniel S. Gwertzman, Esq.
345 Seventh Avenue, 21st Floor
New York, NY 10001

*Attorneys for Claimants*

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

-------------------------------------------------------------X
MARY KREVOSH,

Claimant,

FINRA No.:

v.

WESTMINSTER FINANCIAL SECURITIES, INC.

Respondents.
-------------------------------------------------------------X

---

**STATEMENT OF CLAIM**

---

Mary Krevosh ("Krevosh" or "Claimant") brings this claim pursuant to the Financial Industry Regulatory Authority ("FINRA") Code of Arbitration Procedure, by and through her attorneys, Gana LLP, against Respondent Westminster Financial Securities, Inc. ("Westminster" or "Respondent").

Claimant brings this arbitration proceeding before FINRA pursuant to FINRA Rule 12200, which requires a member or an associated person to arbitrate disputes arising out of the associated person or member's business activity or the contract entered into between the parties. Claimant requests a hearing in Las Vegas, Nevada. Claimant also asks that an all-public panel hear Claimant's case. Claimant seeks damages of approximately $426,000 plus interest,

attorneys' fees, and all forum fees.[1] Accordingly, Claimant alleges, upon information and belief, as follows:

## PARTIES

### CLAIMANT

***Mary Krevosh***

Mary Krevosh resided at 1 Hughes Center Drive, Suite 1701, Las Vegas Nevada during the relevant period.

### RESPONDENT

***Westminster Financial Securities, LLC***

Westminster' principal place of business is 40 North Main Street, Suite 2400, Dayton, OH 45423. Westminster is a member of FINRA and registered with the Securities and Exchange Commission ("SEC"). Westminster's Central Registration Depository ("CRD") Number is 20677 and SEC number is 38426. As a FINRA member Westminster is bound to follow all the rules and requirements of the organization in the handling of Claimant's accounts. Since Westminster is registered to conduct securities business in the state of Nevada and the conduct alleged herein occurred within Nevada and with a Nevada resident, Westminster's conduct was required to comport with Nevada law.

## RELEVANT NON-PARTY

***Louis Telerico***

Louis Anthony Telerico (CRD No. 443875) was Ms. Krevosh's financial advisor at all times relevant hereto. Mr. Telerico was employed by Westminster from April 2012, through June 2016, at which point he left the financial industry. Mr. Telerico has over a dozen customer complaints

[1] Claimants reserve the right to amend the amount of damages ultimately claimed at hearing upon completion of discovery.

against him. Mr. Telerico has also been embroiled in extensive litigation, which has resulted in extraordinary attorney bills and liens on his property.

**FACTUAL BACKGROUND**

Mary Krevosh and Donald Krevosh met in or around 2005, and later got married in June 2007. Mrs. Krevosh was real estate broker and writer until around 2005. Mrs. Krevosh had a hard time working since she had long suffered from Guillain-Barre Syndrome. Mr. Krevosh was a longtime executive with United Parcel Service ("UPS"), before retiring after about a thirty-three year career. Upon retiring, Mr. Krevosh had a substantial amount of UPS stock, which for years had been managed by BNY Mellon.

In or around 2008, former Westminster broker, Louis Telerico, convinced the Krevoshes to move a substantial portion of their assets, including the UPS stock, to him and his firm, which at the time was Butler, Wick & Co., Inc. Mr. Krevosh were first cousins. Though they were family, Mr. Krevosh and Mr. Telerico did not become close until around June 2006. Prior to then, Mr. Krevosh had never done business with Mr. Telerico.

In January 2009, Butler, Wick & Co., Inc. was acquired by Stifel, Nicolaus & Company, Inc. In or around 2010, Mr. Telerico sold all of Mr. Krevosh's UPS stock and asked the Krevoshes to trust him with his investment recommendations. In April 2012, Mr. Telerico left Stifel Nicolaus and began working for Westminster. Mr. Telerico took the Krevoshes' business with him.

From 2010 forward, Mr. Telerico mishandled the Krevoshes money. Most notably, however, were the following two investment recommendations: (1) In or around August 2012, Mr. Telerico recommended that the Krevoshes invest $200,000 in a bronze bear statue and (2) In or around July 2013, Mr. Telerico had the Krevoshes invest $225,000 in approximately 27 acres of land in Aurora, Ohio.

**A. The Bronze Bear Statue**

In or around August 2012, Mr. Telerico recommended that the Krevoshes take $200,000 out of one of their Westminster accounts to purchase, what Mr. Telerico described as a very valuable bronze bear statue (the "Bronze Bear Statue"). In or around August 2012, in compliance with Mr. Telerico's instructions, the Krevoshes transferred $200,000 from Westminster account number XXXXX-3826 to Mr. Telerico. After transferring the $200,000 to Mr. Telerico, Mr. Telerico never delivered the Bronze Bear Statue causing the Krevoshes a loss of $200,000 on the investment recommendation.

**B. The Ohio Land Purchase**

In or around July 2013, Mr. Telerico recommended that the Krevoshes purchase approximately 27 acres of land in Aurora, Ohio (the "Ohio Land"). In compliance with Mr. Telerico's instructions, the Krevoshes wired approximately $226,000 from their Citizens bank account to a Guardian Title escrow account. Shortly thereafter, the Krevoshes funds were frozen. The Krevoshes were forced to hire an attorney and endure a four-year litigation before obtaining legal title to the Ohio Land. However, the Ohio Land is ostensibly worthless causing the Krevoshes a loss of $226,000 on the investment recommendation.

Unfortunately, Mr. Krevosh passed away in October 2013. Pursuant to the terms of Mr. Krevosh's pension, all payments ceased. Mrs. Krevosh was left with the assets that the Krevoshes maintained at Westminster. Mrs. Krevosh was extremely grief stricken during this time of mourning. Yet, Mr. Telerico continued to come to Mrs. Krevosh to ask her to wire additional funds for various reasons.

In or around January 2016, Mrs. Krevosh received a call from Westminster to inform her that she had essentially run out of money and there were margin calls on her account. Mrs.

Krevosh subsequently called Westminster to speak to Mr. Telerico only to learn, for the first time, that Mr. Telerico no longer worked for the firm.

## LEGAL CLAIMS

## POINT I.

## WESTMINSTER FAILED TO SUPERVISE MR. TELERICO'S "SELLING AWAY" ACTIVITIES IN VIOLATION OF FINRA RULES

The FINRA Rules require that member firms have and implement specific safeguards to ensure that their associated persons do not violate FINRA Rules. If the member firm unreasonably fails to stop the associated person's wrongdoing, the member firm is responsible for damages arising from that failure. Here, Westminster unreasonably failed to stop Mr. Telerico from illegally recommending the investments in the Bronze Bear Statue and the Ohio Land. Thus, Westminster is liable for damages arising out of Mr. Telerico's wrongdoing.

A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees. FINRA Rule 3010 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

FINRA Rule 3010: SUPERVISION.

A failure to supervise claim requires showing: "(i) an underlying securities law violation; (ii) association of the registered representative or other person who committed the violation; (iii) supervisory jurisdiction over that person; and (iv) failure of the broker-dealer and/or supervisory personnel to reasonably supervise the person who violated the securities laws." *See In re Phila. Investors, LTD.*, S.E.C. Rel. No. 123, 1998 WL 122180 at*11 (Mar. 20, 1998).

FINRA Rule 3010 also holds firms to a reasonable supervision standard that is to be determined based on the particular facts of each case. *Department of Enforcement v. Kernweis*, 2000 WL 33299605 at *13 (N.A.S.D.R. 2000). This standard is violated "where a supervisor was aware only of 'red flags' or 'suggestions' of irregularities." *In the Matter of the Application of Michael H. Hume* ("Hume"), Exchange Act Rel. No. 35608, 52 S.E.C. 243, 1995 SEC LEXIS 983, at*5 (Apr. 17, 1995). In addition, the SEC has noted that "[l]iability for failure to supervise may be imposed when a supervisor '[fails] to learn of improprieties when diligent application of supervisory procedures would have uncovered them."' *Kernweis*, 2000 WL 33299605 at *13 (*quoting In re Scudder Investments, Inc.* ("Scudder Investments"), Investment Act Rel. No. 24218, 1999 SEC LEXIS 2737, at *18 (Dec. 22, 1999). "Under such circumstances a supervisor cannot discharge his or her supervisory obligations simply by relying on the unverified representations of employees." *Hume*, 52 S.E.C. 243, 1995 SEC LEXIS 983, at*5.

As shown below, Westminster failed to reasonably supervise Mr. Telerico's activities.

**A. Mr. Telerico Committed An Underlying Securities Violation**

Mr. Telerico violated federal, state, and FINRA securities laws constituting an underlying securities violation. The Bronze Bear Statue and the Ohio Land were sold without private placement memorandums or any other offering document that disclosed the risks associate with the respective purchases. Mr. Telerico misrepresented the nature of these investments to the Krevoshes' detriment.

**B. Mr. Telerico Was Associated With Westminster**

Under FINRA Rule 12100(r) a "Person Associated with a Member" includes "a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt

from registration with FINRA under the By-Laws or the Rules of FINRA." Further, "a person formerly associated with a member is a person associated with a member."

Mr. Telerico is a formerly associated person of Westminster and was registered with Westminster when he recommended the investments in the Bronze Bear Statue and the Ohio Land. Accordingly, there is no dispute that Westminster is responsible for supervising their associated persons in selling and advising Claimant on the Bronze Bear Statue and the Ohio Land, which are at issue in this case. *See John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 58-59 (2d Cir. 2001) (*citing First Montauk Sec. Corp. v. Four Mile Ranch Dev.*, 65 F.Supp.2d 1371, 1379 (S.D.Fla.1999) ("A dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business."); *Multi-Fin. Sec. Corp. v. King,* 386 F.3d 1364, 1369 (11th Cir. 2004) (*citing Vestax Secs. Corp. v. McWood*, 280 F.3d 1078, 1082 (6th Cir.2002) (rejecting the argument that the Code requires the defendant-investors be direct customers of the NASD member firm in order to compel arbitration against the member); *see also BMA Fin. Servs., Inc. v. Guin*, 164 F.Supp.2d 813, 820 (W.D.La. 2001) ("Rule 10301(a) does not require the Defendant–Investors to be direct customers of [the member]. Instead, they fit within the confines of the Rule—and therefore may require [the member] to arbitrate—even if they are only customers of [the member's] 'associated person' and not [the member].").

**C. Westminster Had Supervisory Jurisdiction Over Mr. Telerico**

In addition to FINRA Rule 3010, numerous other notices to members, FINRA, SEC, and court decisions hold the securities laws impose upon broker-dealers the duty and obligation to properly monitor and supervise its employees. NTM 97-19: Heightened Supervision ("Firms are reminded of their long-standing responsibilities to implement reasonable procedures designed to detect and prevent rule violations and to correct deficiencies in, and violations of, relevant laws, rules, and regulations."); *see also* NTM 98-38 ("Rule 3010(c) imposes upon a member the

obligation to review the activities of each office, which includes the periodic examination of customer accounts to detect and prevent irregularities and abuses.")

FINRA has also specifically stated that members have supervisory jurisdiction responsibilities to detect and monitor associated persons outside business activities. As far back as 1986, the NASD warned its members that the conduct of its registered representatives most frequently resulting in violations of NASD rules involved unauthorized private securities transactions. *See*, NASD Notice To Members 86-65. Indeed, the NASD explicitly directed this warning to firms that employ registered representatives stating that such firms "are responsible for monitoring their activities in a manner reasonably intended to detect violations of Article III, Section 40 of the Rules of Fair Practice" (now codified as FINRA Rule 3040). *Id.*; *see also* NASD Notice To Members 01-79 (stating "members should review their supervisory and compliance procedures to make sure that their reporting requirements are clear and complete and that each associated person receives appropriate education and training regarding the sale of notes."). Further, a member's supervisory jurisdiction extends to supervising associated persons working in unregistered offices, sometimes under trade names other than the member's. *See* NTM 98-38 ("[t]o be effective...[supervision] must be designed to monitor securities-related activities and detect and prevent regulatory compliance problems of such associated persons working at unregistered offices…").

The SEC and FINRA have repeatedly advised firms like Corporate Respondents that they are responsible for supervising all of their representatives' sales of securities, whether sold through "regular" channels or not. Under FINRA Rule 3040 "No person associated with a member shall participate in any manner in a private securities transaction except in accordance

with the requirements of this Rule."[2] FINRA has warned firms that it is their responsibility to "review their supervisory procedures to make sure that they are reasonably designed to achieve compliance with [FINRA] Rules 3030 and 3040 regarding outside business activities and private securities transactions…" NTM 01-79: Selling Away And Outside Business Activities.

In enforcing this FINRA Rules 3010 and 3040, the SEC and NASD have repeatedly fined, censured and de-registered firms that failed to prevent their brokers from "selling away." *See, e.g., In re Kolar*, Exchange Act Rel. No. 46127, 2002 SEC Lexis 1647 (June 26, 2002) (suspending Dean Witter supervisor who failed to detect and prevent broker's sales of investments, promoted as collateral-backed promissory notes in "Lease Equity Fund, Inc."); *In re Kunz*, Exchange Act Rel. No. 45290, 2002 SEC Lexis 104 (Jan. 16, 2002) (disciplining broker-dealer that failed to prevent broker's sales of "Wholesale Mortgage Loan Participation Interests"); *In re Consolidated Investment Serv*., Exchange Act Rel. No. 36687, 1996 SEC Lexis 83; 52 S.E.C. 582 (Jan. 5, 1996) (suspending firm for failing to detect and prevent broker's sales of $5 million of non-existent "Agency CD Notes"); *In re Royal Alliance Assoc*., Exchange Act Rel. No. 38174, 1997 SEC Lexis 113 (Jan. 15, 1997) (disciplining firm that failed to stop two branch managers from selling Ponzi schemes); *In re Stuart, Coleman & Co.*, Exchange Act Rel. No. 38001, 1996 SEC Lexis 3266 (Dec. 2, 1996) (disciplining firm where branch manager had permitted registered representatives to sell fraudulent limited partnership interests, even though firm had explicitly refused written request for permission); *In re Prospera Financial Serv., Inc*., Exchange Act Rel. No. 43352, 2000 SEC Lexis 2034 (Sept. 26, 2000) (holding firm responsible for failure to supervise part-time representatives, because "allowing a registered representative to

[2] FINRA Rule 3040(e)(1) defines "Private securities transaction" as "any securities transaction outside the regular course or scope of an associated person's employment with a member, including, though not limited to, new offerings of securities which are not registered with the Commission." Clearly the Bronze Bear Statue and the Ohio Land were securities sold outside the regular course of Respondent's employment and were not registered with the SEC.

engage in outside business activities involves the risk that the representative will use his outside business to carry out or conceal violations of the securities laws.”).

Therefore, Westminster had an obligation to employ effective supervisory procedures in order to monitor and detect outside business activities such as those conducted by Mr. Telerico.

**D. Westminster Failed To Reasonably Supervise Mr. Telerico**

The FINRA Rules provide the standard of care a firm must adhere to in order to reasonably supervise their agents. NASD NTM 99-45 states that:

> [i]t is important that members not only review their supervisory systems and procedures to ensure that they are current and adequate, but also conduct inspections to determine whether the systems and procedures are being followed.

Such “[i]nspections of unregistered offices should include, among other things, a review of any on-site customer account documentation and other books and records, meetings with individual registered representatives to discuss the products they are selling and their sales methods, and an examination of correspondence and sales literature.” NTM 98-38: NASD Reminds Members Of Supervisory And Inspection Obligations, pg. 274. Further, “[u]nannounced visits may be appropriate, particularly where there are indicators of misconduct or potential misconduct, or 'red flags.’” *Id.*; *see also In Re Mabon Nugen & Co.*, Exchange Act Rel. No. 27301, 44 S.E.C. Docket 1116 (Sept. 27, 1989). (the SEC stated that effective supervision by broker-dealers is a critical element which should ensure regulatory compliance through a system of follow-ups and reviews); *In re Stuart, Coleman & Co.*, Exchange Act Rel. No. 38001, 1996 SEC Lexis 113 (Jan. 15, 1997) (the court held the firm “failed to institute and implement adequate compliance control procedures over the branch office because it failed to take measures including…conducting unannounced branch office inspections and using inspection criteria…to detect and prevent the securities law violations…”).

Here, Westminster failed to supervise Mr. Telerico's "selling away" outside business activities when it allowed Mr. Telerico to recommend and sell the Bronze Bear Statue and the Ohio Land.

Westminster was obligated to conduct on-site investigations and review client files to detect and monitor suspicious activity. Had Westminster reviewed Mr. Telerico's files they likely would have discovered evidence of his wrongdoing. In addition, Westminster was responsible for having systems in place to monitor Mr. Telerico's communications with customers for suspicious activity. However, Westminster failed to monitor Mr. Telerico's communications with clients, which ultimately allowed for Mr. Telerico's misconduct.

**POINT II.**

**WESTMINSTER IS LIABLE FOR MR. TELERICO'S MISCONDUCT UNDER THE THEORIES OF CONTROL PERSON LIABILITY AND RESPONDEAT SUPERIOR**

**A. "Control Person" Liability**

Westminster are also liable to Claimant for all of Mr. Telerico's misconduct under the theory of "control person" liability. Both federal and state securities acts impose "control person" liability on all persons who have the power, direct or indirect, exercised or not, to control another's sale of securities. *See, e.g.*, 15 U.S.C.A. § 78t (2011) (stating "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable…").

As used in all such securities acts, "the term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson*

*& Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981). The Ninth Circuit Court of Appeals explained that broker-dealers are conclusively the "control persons" of their registered representatives because:

> [A]s a practical matter the broker-dealer exercises control over its registered representatives because the representatives need the broker-dealer to gain access to the securities markets.... [A] person cannot lawfully engage in the securities business unless he or she is either registered with the NASD as a broker-dealer or as a person associated with a broker-dealer. Because a sales representative must be associated with a registered broker-dealer in order to have legal access to the trading markets, the broker-dealer always has the power to impose conditions upon that association, or to terminate it.... Moreover, because the broker-dealer is required by statute to establish and enforce a reasonable system of supervision to control its representatives' activities, the broker-dealer necessarily exerts ongoing control over the types of transactions made by the representative . . .

*Hollinger v. Titan Capital Corp*., 914 F.2d 1564, 1573-74 (9th Cir. 1990).

Westminster was a "control person" of Mr. Telerico during the relevant time period. Therefore, Westminster is liable for Mr. Telerico's misconduct, including but not limited to, Mr. Telerico's unsuitable recommendations and material misrepresentations and omissions.

**B. Respondeat Superior**

Westminster is liable to Claimant for all of Mr. Telerico's misconduct under the theory of respondeat superior. Broker dealers are vicariously liable for the acts of its agents and employees committed in the scope of employment. The doctrine of *respondeat superior* imposes liability on an employer for the wrongful acts of his agent committed within the scope of employment. *See Armstrong Jones & Co. v. S.E.C*, 421 F.2d 359 (6th Cir. 1970), *cert, denied*, 398 U.S. 958 (1970) (in action by SEC against firm under Exchange Act for failure to supervise, liability thereunder is akin to *respondeat superior*); *see also* Restatement (Second) of Agency § 261 ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting

within his authority, to commit fraud upon third persons is subject to liability to such third persons for the fraud").

At all relevant periods Westminster knew or should have known that Mr. Telerico was engaged in unreported outside business activity, which increased the likelihood that Mr. Telerico was "selling away" and diverting customer assets from Westminster. Accordingly, Westminster is liable for Mr. Telerico's misconduct.

FINRA Rule 2010 requires members to "observe high standards of commercial honor and just and equitable principles of trade" in conducting their business. FINRA Rule 2020 also prohibits members from effecting "any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance." IM-2310-2 - "Fair Dealing with Customers" is cross-referenced by both of the aforementioned provisions and provides a non-exhaustive list of activities that would be inconsistent with the foregoing principals. *See* IM-2310-2: FAIR DEALING WITH CUSTOMERS. The first section of IM-2310-2 outlines member and associated persons obligations in dealing with customers as follows:

> (a)(1) Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

Mr. Telerico egregiously and intentionally violated many of the subsections of IM-2310-2, including but not limited to:

> **(iv) Misuse of Customers' Funds or Securities**
> Unauthorized use or borrowing of customers' funds or securities.
>
> (B) In addition, other fraudulent activities, such as forgery**, non-disclosure or misstatement of material facts, manipulations and various deceptions, have been found in violation of Association Rules.** These same activities are also subject to the

> civil and criminal laws and sanctions of federal and state governments.
>
> ***
>
> **(5) Recommending Purchases Beyond Customer Capability**
> Recommending the purchase of securities or the continuing purchase of securities in amounts which are inconsistent with the reasonable expectation that the customer has the financial ability to meet such a commitment.

Mr. Telerico made numerous misstatements and omissions of information in his communication with Claimant concerning the Bronze Bear Statue and the Ohio Land.

Mr. Telerico also had a duty to provide Claimant with sound investment advice that fairly and accurately described the nature of the investments and the risks associated with the investments. Instead, he made misrepresentations and omissions to Claimant in violation of the FINRA Rules. FINRA Rule 2210(d) states in relevant part:

> All member communications with the public shall be based on principles of fair dealing and good faith, must be **fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security**, industry, or service. No member may omit any material fact or qualification if the omission, in the light of the context of the material presented, would cause the communications to be misleading.

FINRA Rule 2210(d) COMMUNICATIONS WITH THE PUBLIC (emphasis added). In the context of a broker who prepares a private placement memorandum, any "material misstatements and omissions about… the amount and timing of distributions and the targeted return of principal to investors violate[] FINRA Rule 2010, which requires BDs to comply with just and equitable principles of trade." FINRA NTM 10-22, OBLIGATION OF BROKER-DEALERS TO CONDUCT REASONABLE INVESTIGATIONS IN REGULATION D OFFERINGS, 5.

**POINT III.**

**MR. TELERICO MADE FRAUDULENT MISREPRESENTATIONS AND OMISSIONS TO CLAIMANT IN VIOLATION OF FEDERAL AND STATE SECURITIES LAW**

Mr. Telerico made material misrepresentations and omissions to Claimants in violation of federal securities laws. Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. *See* 15 U.S.C.S. §78j. The SEC, pursuant to 15 U.S.C.S. §78j, promulgated S.E.C. Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5).[3]

In a typical § 78j(b) private action, a plaintiff must prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

Nevada Uniform Securities Act states: that

> [i]n connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly: 1. Employ any device, scheme or artifice to defraud; 2. Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made; or 3.

[3] Rule 10b-5 makes it unlawful:

a) to employ any device, scheme, or artifice to defraud;
b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

> Engage in an act, practice or course of business which operates or would operate as a fraud or deceit upon a person

Nev. Rev. Stat. Ann. § 90.570.

As alleged herein, Mr. Telerico made numerous material misrepresentations and omitted information from Claimant, which caused Claimant damages.

## POINT IV.

## MR. TELERICO VIOLATED HIS SUITABILITY OBLIGATIONS

A broker-dealer and its brokers have a duty to recommend only suitable investments to their clients. A member is required to make recommendations according to the following fundamental suitability obligations: (1) a broker must have a reasonable basis to believe, after performing adequate due diligence, that the recommendation could be suitable for *some* investors, also known as "reasonable basis" suitability; and (2) a broker must have reasonable grounds to believe that the recommendation is suitable for the specific customer at issue, also known as "customer specific" suitability. *See, e.g., Dep't of Enforcement v. Michael F. Siegel*, 2007 WL 1928639, at *12 (N.A.S.D.R. 2007).

The scope of these duties are defined in FINRA Rule 2310, also known as the "Suitability Rule," which provides:

> (a) In recommending to a customer the purchase, sale or exchange of any security, a member shall have **reasonable grounds** for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to her other security holdings and as to her financial situation and needs.
>
> (b) Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make **reasonable efforts to obtain information** concerning:

> (1) the customer's financial status;
> (2) the customer's tax status;
> (3) the customer's investment objectives; and
> (4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

*See* NASD Rule 2310, RECOMMENDATIONS TO CUSTOMERS (SUITABILITY) (emphasis added).

**A. Reasonable Basis**

Mr. Telerico did not have a reasonable basis to recommend the Bronze Bear Statue or the Ohio Land to Claimant. FINRA's Notice to Members 05-59 states, "[t]o discharge its reasonable basis suitability obligation, a member must perform appropriate due diligence to ensure that it understands the nature of the product, as well as the potential risks and rewards." *See* FINRA Notice to Members 05-59, STRUCTURED PRODUCTS. After engaging in this analysis, the member must have a reasonable basis to believe that the products are suitable for *some* investors.

Mr. Telerico had no reasonable basis to believe that the Bronze Bear Statue or the Ohio Land were suitable for *any* investor.

**B. Customer Specific Suitability**

FINRA Rule 2310 also requires the broker to have a reasonable basis to believe that the recommendation is suitable for the particular customer based on the customer's investment profile. The investment profile includes items such as: financial situation, tax status, investment objectives, risk tolerance, age, and investment experience. *See* FINRA Rule 2310, Recommendations to Customers (Suitability). Further, FINRA states, "[i]n the context of a Regulation D [private placement] offering… A BD also must be satisfied that the customer 'fully understands the risks involved and is…able…to take those risks.'" FINRA NTM 10-22, OBLIGATION OF BROKER-DEALERS TO CONDUCT REASONABLE INVESTIGATIONS IN REGULATION D OFFERINGS, 4. Furthermore, when a broker dealer is affiliated with the issuer of the security, the broker must

> ensure that its affiliation does **not compromise its independence** as it performs its investigation. The BD must **resolve any conflict of interest that could impair its ability to conduct a thorough and independent investigation**. Indeed, its affiliation with the issuer typically would raise expectations by its customers, particularly some retail customers, that the BD has special expertise concerning the issuer.

*Id.* at 5.

Mr. Telerico recommended an unsuitable, risky, speculative and illiquid investment to Claimant without regard for her individual needs and investment objectives.

**POINT V.**

**MR. TELERICO VIOLATED FINRA RULE 2210 (COMMUNICATIONS WITH CUSTOMERS), 2010 (FIDUCIARY DUTY), 2020 (FRAUD), AND IM-2310-2 (FAIR DEALING WITH CUSTOMERS)**

FINRA Rule 2010 requires members to "observe high standards of commercial honor and just and equitable principles of trade" in conducting their business. FINRA Rule 2020 also prohibits members from effecting "any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance." IM-2310-2 - "Fair Dealing with Customers" is cross-referenced by both of the aforementioned provisions and provides a non-exhaustive list of activities that would be inconsistent with the foregoing principals. *See* IM-2310-2: FAIR DEALING WITH CUSTOMERS. The first section of IM-2310-2 outlines member and associated persons obligations in dealing with customers as follows:

> (a)(1) Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

Mr. Telerico egregiously and intentionally violated many of the subsections of IM-2310-2, including but not limited to:

> (B) In addition, other fraudulent activities, such as forgery**, non-disclosure or misstatement of material facts, manipulations and various deceptions, have been found in violation of Association Rules.** These same activities are also subject to the civil and criminal laws and sanctions of federal and state governments.
>
> ***
>
> **(5) Recommending Purchases Beyond Customer Capability**
> Recommending the purchase of securities or the continuing purchase of securities in amounts which are inconsistent with the reasonable expectation that the customer has the financial ability to meet such a commitment.

Mr. Telerico made numerous misstatements and omissions of information in his communication with Claimant concerning the Bronze Bear Statute and the Ohio Land.

Mr. Telerico also had a duty to provide Claimant with sound investment advice that fairly and accurately described the nature of the investments and the risks associated with the investments. Instead, he made negligent misrepresentations and omissions to Claimants in violation of the FINRA Rules. FINRA Rule 2210(d) states in relevant part:

> All member communications with the public shall be based on principles of fair dealing and good faith, must be **fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security**, industry, or service. No member may omit any material fact or qualification if the omission, in the light of the context of the material presented, would cause the communications to be misleading.

FINRA Rule 2210(d) COMMUNICATIONS WITH THE PUBLIC (emphasis added). In the context of a broker who prepares a private placement memorandum, any "material misstatements and omissions about… the amount and timing of distributions and the targeted return of principal to investors violate[] FINRA Rule 2010, which requires BDs to comply with just and equitable principles of trade." FINRA NTM 10-22, OBLIGATION OF BROKER-DEALERS TO CONDUCT REASONABLE INVESTIGATIONS IN REGULATION D OFFERINGS, 5.

## POINT VI.

## DAMAGES

As a cause and consequence of the misconduct engaged in by Respondent, its employees, agents and representatives, including Mr. Telerico, among others, in the handling of Claimants' account, Claimants suffered compensatory and other damages of approximately $426,000 known to date.

Respondent's conduct toward Claimant was willful and unconscionable. No excuse or justification exists for Respondents' wrongful acts as set forth in detail above. As such, the panel should also award punitive damages, interest at the legal rate under Nev. Rev. Stat. Ann. § 17.130, as well as attorneys' fees, and costs.

Arbitrators have the power to award exemplary, or in other words, punitive damages. As the United States Supreme Court held in *Mastrobuono v. Shearson Lehman Hutton. Inc.*, 514 U.S. 52 (1995), the Federal Arbitration Act, 9 U.S.C. § 1 et seq., grants arbitrators plenary authority to consider and make an award of punitive damages notwithstanding any provision of state law to the contrary.

Punitive damages are appropriate where there is an intentional wrongdoing in the sense of an "evil-minded act." *McMahon v. Chryssikos*, 218 N.J. Super. 571, 573, 528 A.2d 104, 105 (Law Div. 1986). Alternatively, punitive damages may be warranted where the defendant's conduct arises from an act accompanied by a willful and wanton disregard of the rights of others. *Id.* (*citing Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 49, 477 A.2d 1224 (1984); *DiGiovanni v. Pessel*, 55 N.J. 188, 190, 260 A.2d 510 (1970); *Berg v. Reaction Motors Div.*, 37 N.J. 396, 414, 181 A.2d 487 (1962)). Punitive damages have also been characterized as "intentionally inflicting harm or acting in such a gross, wanton way, such a terrible way, so

recklessly in disregard of what might happen to someone." *Fischer v. Johns-Manville*, 103 N.J. 643, 671, 512 A.2d 466 (1986); *see also Enright v. Lubow*, 202 N.J.Super. 58, 76, 493 A.2d 1228 (App.Div. 1985). "While punitive damages are intended to punish the wrongdoer, they are also intended to deter both the wrongdoer and others from similar outrageous conduct in the future." *McMahon*, 218 N.J. Super. at 573.

Here, punitive damages should be assessed against Respondent due to Mr. Telerico's intentional and fraudulent misconduct. An award that falls short of assessing punitive damages will not take the necessary step of impressing upon Respondent of the indisputable need to act in accordance with the rules of law and the business ethics of fair trade. Awarding Claimant only compensatory damages, would represent only the "cost of doing business" to entities such as Westminster that are aware of misconduct yet fail to rectify the wrongdoing.

## CONCLUSION

WHEREFORE, Claimants requests that this Panel award damages against Respondents as follows:

1. Compensatory damages for a sum of $426,000;
2. Interest at the statutory rate;
3. Attorneys' Fees;
4. Expert Fees;
5. Forum Fees;
6. Punitive Damages;
7. Such other and further relief as this Panel deems just and proper.

Dated: April 18, 2017

Respectfully Submitted,
GANA LLP

By: ______________________________

Adam J. Gana, Esq.
Adam J. Weinstein, Esq.
Daniel S. Gwertzman
345 Seventh Avenue, 21st Floor
New York, New York 10001
(212) 776-4251

*Attorneys for Claimants*